

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00260-CR
### NO. 02-15-00261-CR

THOMAS PAUL TADSEN                                          APPELLANT

V.

THE STATE OF TEXAS                                               STATE

------------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NOS. 1378634R, 1379351R

----------

## MEMORANDUM OPINION[1]

----------

In two points, Appellant Thomas Paul Tadsen appeals his convictions for evading arrest and driving while intoxicated (DWI).  *See* Tex. Penal Code Ann. §§ 38.04(b)(2)(A), 49.04 (West Supp. 2015).  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

**Background**

At approximately 4:40 p.m. on Friday, June 20, 2014, Officer Kristopher Donahey of the Fort Worth Police Department was driving east on East Berry Street in Fort Worth when he observed a silver Ford F-150 pickup truck stopped in the center of the roadway ahead. The pickup was positioned perpendicular to and blocking three lanes of traffic so that no traffic could pass. As Officer Donahey neared, he could see the driver, later identified as Appellant, through the back window of the truck.

At first Appellant appeared to be experiencing convulsions, but then Officer Donahey realized that Appellant was actually vomiting on himself.[2] Unsure if Appellant was "drunk [and] puking" or if there was a medical emergency, Officer Donahey activated the rear police lights on his patrol car,[3] got out of the vehicle, and approached the truck in an attempt to make contact with Appellant. According to Officer Donahey, as he approached the vehicle, he smelled the odor of alcohol, but when Appellant noticed Officer Donahey, he gave the officer a "dismissive hand wave" and took off in his pickup.

---

[2]Video recorded by a dash camera in Officer Donahey's vehicle captured Officer Donahey's observations of Appellant and his driving and was admitted at trial.

[3]At the time, Officer Donahey was a part of the Zero Tolerance section of the Tactical Operations Division of the Fort Worth Police Department. On June 20, 2014, he was patrolling in plain clothes in a police car that was marked, but not equipped with overhead lights. At the time he encountered Appellant, he was headed home from his ten-hour shift.

As Appellant drove away, the driver's door to the pickup was still open and Officer Donahey could see Appellant vomiting out of the door and on himself. Officer Donahey also observed Appellant swerve into a different lane, then back into the far right lane, and drive up on a curb before he came to a stop behind two cars waiting for the light at the intersection of East Berry Street and Interstate 35 to turn green. In the meantime, Officer Donahey returned to his vehicle, followed Appellant to the intersection, pulled in behind him, activated his patrol car lights, called out to Appellant on the radio speaker, got out of his car, and again began to approach Appellant's truck. Concerned that, clad in plain clothes, he might be mistaken for a robber or a car-jacker in that high-crime neighborhood, Officer Donahey testified that as he approached Appellant's pickup, he held up his badge and verbally identified himself as a police officer. According to Officer Donahey, when he reached the pickup, Appellant rolled his window down and looked at him with a look of "oh, crap, I'm caught." He described Appellant's eyes as "huge, like saucers, if you will" and Appellant was "covered" in vomit from his collarbone to his lap. As soon as Appellant rolled down his window, Officer Donahey could smell a "very strong odor" of what was "absolutely" alcohol.

Because he felt that Appellant was "at a high level of intoxication," and could not safely operate the vehicle, Officer Donahey's primary goal at this point was to separate Appellant from his vehicle. While Officer Donahey stood beside the driver's window talking to Appellant, he repeatedly tried to convince Appellant

3

to put his pickup in park, get out of the vehicle and sit on the tailgate so that Officer Donahey could call an ambulance. According to Officer Donahey, Appellant just stared at him blankly, and at one point mumbled something that Officer Donahey could not understand because Appellant's speech was slurred. But Officer Donahey's attempts to persuade Appellant to leave his vehicle proved unsuccessful—

> I knew that the situation was about to get really bad when—the light had turned green, I didn't know it, but I saw him—he went from looking at me to looking straight. And I could see out of my peripheral traffic began to flow.

As soon as the vehicles in front of him began to move, Appellant took off again, driving through the intersection and turning right—narrowly missing a pedestrian in the crosswalk—and entering the freeway heading south.

Officer Donahey returned to his patrol car and began to follow in pursuit. But by the time Officer Donahey got back into his patrol car and entered the freeway, Appellant was so far ahead that—even at speeds which at times reached 105 miles per hour—Officer Donahey could not catch up to him. Although he never managed to close the distance, Officer Donahey could see Appellant's pickup ahead of him, and he described Appellant's driving during the chase as "very erratic" especially given the high volume of rush-hour traffic present on the roadway that Friday afternoon.

Officer Donahey had contacted police dispatch requesting assistance when Appellant entered the freeway, and Officer Joshua Nichols and Officer

4

Chris Kight[4] quickly responded.[5]  Driving a Chevrolet Tahoe, they entered southbound Interstate 35 from Interstate 20 and positioned their vehicle ahead of Appellant and Officer Donahey.

Just as Appellant passed the Tahoe, the officers observed Appellant almost rear-end another car ahead of him.  Officer Nichols testified that traffic on the interstate was heavy, and when he observed the near-collision, he yelled aloud out of fear for the safety of those inside.  He testified at trial: "I honestly thought, you know, at the speed he was going, I thought he was going to run into the car ahead of them.  I was worried for the people inside of it."

Appellant continued to weave in and out of traffic and Officer Nichols' fears eventually came to pass.  Driving at a speed that Officer Donahey estimated to be between 50 and 60 miles per hour, Appellant rear-ended a small, red sedan, which, in turn, rear-ended a Ford extended-cab pickup, which, in turn, pushed into another Ford extended-cab pickup, resulting in a four-car pileup.  Officer Donahey testified at trial that Appellant drove his pickup that afternoon in a manner that "very easily" could have caused "death or serious bodily injury to another person."  Fortunately, the driver of the sedan, which was sandwiched

_____

[4]Officer Kight's name is misspelled as "Knight" at points in the record but Officer Nichols clarified that it is properly spelled "Kight."

[5]The dashboard-camera video recorded in the second police unit was also admitted into evidence.

between the larger pickup trucks, testified that she sustained only bruising and a small scar on her wrist as a result of the collision.

Appellant was taken into custody from the scene. A blood test later revealed that Appellant's blood alcohol content was 0.235.[6]

Appellant was charged with evading arrest and DWI. Both indictments included repeat offender notices connected to a 1994 felony conviction for burglary and notices of a deadly weapon finding alleging that Appellant used his vehicle as a deadly weapon in committing the crimes. Additionally, the DWI indictment alleged that Appellant had been twice previously convicted of DWI. After the cases were consolidated, Appellant pleaded guilty to each of the primary offenses and "Not True" to the deadly weapon allegations. The jury found Appellant guilty and further found that he had used his vehicle as a deadly weapon in the commission of both offenses. Appellant was sentenced to 7 years' confinement on each offense, to be served concurrently.

**Discussion**

**I. Deadly weapon finding**

In his first issue, Appellant argues that there was insufficient evidence to sustain the deadly weapon findings for each offense.

---

[6]The legal limit is 0.08. *See* Tex. Penal Code Ann. § 49.01(2)(B) (West 2011).

In our due process review of the sufficiency of the evidence to support this deadly weapon finding, we must review the record to determine whether, after viewing the evidence in the light most favorable to the finding, any rational trier of fact could have found beyond a reasonable doubt that the vehicle was used or exhibited as a deadly weapon. *See Brister v. State*, 449 S.W.3d 490, 493 (Tex. Crim. App. 2014); *Cates v. State*, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003). The appellate court's duty is not to reweigh the evidence but to act as a due process safeguard ensuring only the rationality of the factfinder. *Brister*, 449 S.W.3d at 493–94. The evidence is sufficient to support a deadly weapon finding in this case if a rational jury could have concluded that Appellant's use of his vehicle posed an actual danger—that is, one that is "not merely hypothetical"—of death or serious bodily injury. *See Drichas v. State*, 175 S.W.3d 795, 797–98 (Tex. Crim. App. 2005).

In *Drichas*, the court of criminal appeals pointed out that "a motor vehicle may become a deadly weapon if the manner of its use is capable of causing death or serious bodily injury." *Id.* at 798 (citations omitted). The court of criminal appeals held in that case that the motor vehicle was used as a deadly weapon when the defendant drove the wrong way on a highway during a high-speed chase, failed to yield to oncoming vehicles, committed numerous traffic offenses, and abandoned the truck while it was still in motion. *Id.* at 797–98. In comparison, the court of criminal appeals has held that a vehicle was not used as a deadly weapon when there were "very few, if any" other cars on the road and

7

there was no testimony that the defendant caused another vehicle or person to be in actual danger. *Brister*, 449 S.W.3d at 495. In addition to considering the presence of other vehicles or traffic on the roadway, we also consider several other factors in examining whether a defendant's driving was reckless or dangerous: (1) intoxication, (2) speeding, (3) disregarding traffic signs and signals, (4) driving erratically, and (5) failure to control the vehicle. *Cook v. State*, 328 S.W.3d 95, 100 (Tex. App.—Fort Worth 2010, pet. ref'd) (citations omitted).

As set forth above, the facts of this case present substantial evidence that Appellant endangered lives in evading arrest and driving under the influence. In addition to testimony from Officer Donahey and Officer Nichols, the jury also had the benefit of dashboard-camera video recordings from both police units to observe the actual events as they transpired, the traffic conditions on that day, and the resulting collision. Additionally, the evidence showed that Appellant's blood alcohol level was almost three times the legal limit. *See* Tex. Penal Code Ann. § 49.01(2)(B).

This evidence is sufficient to establish that Appellant used his vehicle in such a manner as to present an actual danger of serious bodily injury or death to the other drivers on the road. *See Drichas*, 175 S.W.3d at 798; *Daniel v. State*, 478 S.W.3d 773, 781 (Tex. App.—Fort Worth 2015, no pet.) (holding that appellant used his vehicle as a deadly weapon when he raced it on a "congested and busy street," cutting off other cars and requiring other cars on the roadway to adjust, jumping between lanes, driving very aggressively and at more than twice

the speed limit, and "coming within feet" of rear-ending another car); *Cook*, 328 S.W.3d at 101 (holding that appellant used her vehicle as a deadly weapon when her blood alcohol level was more than two times the legal limit, she was speeding and not maintaining a proper lookout while driving, and collided with a pedestrian, causing his death). We therefore overrule Appellant's first point.

## II. Severity of punishment

In his second point, Appellant argues that the sentence of seven years' confinement for each crime "violates the doctrine of proportionality and is therefore cruel and unusual punishment prohibited by both the Texas and United States Constitutions." The State argues that Appellant did not preserve his complaint because he did not object when the trial court imposed the sentences.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015), *cert. denied*, 136 S. Ct. 1461 (2016). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Everitt v. State*, 407 S.W.3d 259, 263 (Tex. Crim. App. 2013). A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009).

Generally, an appellant may not complain about his sentence for the first time on appeal. *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995); *Mercado v. State*, 718 S.W.2d 291, 296 (Tex. Crim. App. 1986); *Means v. State*, 347 S.W.3d 873, 874 (Tex. App.—Fort Worth 2011, no pet.); *Laboriel-Guity v. State*, 336 S.W.3d 754, 756 (Tex. App.—Fort Worth 2011, pet. ref'd). Appellant did not object to his sentence at the time of pronouncement; nor did he object in a motion for new trial presented to the trial court. As such, Appellant has waived his complaint regarding the length of his sentences. *See Means*, 347 S.W.3d at 874 ("Because Appellant did not object to his sentences when they were imposed or present his motions for new trial to the trial court, he failed to preserve his sentencing complaints for appellate review."). We therefore overrule Appellant's second point.

## Conclusion

Having overruled each of Appellant's points, we affirm the trial court's judgments.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL:  LIVINGSTON, C.J.; GABRIEL and SUDDERTH, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  June 30, 2016

10